UNITE STATES DISTRICT COURT
For The District of Colorado

UNITED STATES OF AMERICA
Plontiff

v.

ALEXANDER ISAIAH PEREZ
Defendant

Case No: 17-cr-00230-MSK

NOTICE -

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
AUG 05 2020
JEFFREY P. COLWELL
CLERK

Defendant hereby gives This Court Notice that an application for HOME CONFINEMENT, or; COMPASSIONATE RELEASE and/or; REDUCTION IN SENTENCE has been submitted to Warden D. Sprout at the United States Penitentiary Marion on July 30, 2020. If Warden Sproul takes no action, within 30 days' notice of receipt of the Application, Defendant intends to file the Application, a copy attached to hereto, in the form of a motion in This Court. Defendant submits this NOTICE as a means to put the date of Submission on record.

Respectfully Submitted

By: [signature]
Alexander Isaiah Perez Pro Se

Alexander Isaiah Perez [44217-013]
C/o United States Penitentiary Marion
P.O. Box 1000
Marion, Illinois
62959

NOTICE OF APPLICATION FOR HOME CONFINEMENT, or; COMPASSI RELEASE under the FSA and/or REDUCTION OF SENTENCE.

TO: Warden Spraul
Date: July 30, 2020

I; Alexander Isaiah Perez, reg. no [44217-013], am hereby submitting the attached Application for HOME CONFINEMENT, or; COMPASSIONATE RELEASE and/or REDUCTION OF SENTENCE.

I am 24 years of age and according to the CDC guidelines; I am well within the concerned age range of contracting and dying from the CoronaVirus Disease 19 (COVID-19) and do believe I am at high risk for contracting COVID-19. As you may well know prisons are a "hot-spot" for this new virus and the infection can spread rapidly through federal prisons (and just recently Marion USP) and several inmates and staff throughout the system has already contracted and died from the virus. Please take any/all necessary action to afford relief or allow me to file a motion for the requested relief in the United States District court for the District of Colorado; Denver division.

This NOTICE and attached Application are being sent to the said mentioned court to be placed on record. Thank you for your time and consideration.

Respectfully,

Alexander Isaiah Perez [44217-013]

APPLICATION FOR HOME CONFINEMENT, or; COMPASSIONATE RELEASE UNDER THE FSA and/or REDUCTION OF SENTENCE

The Bureau of Prisons (B.O.P) uses 18 U.S.C §4205(g) and §3582(c)(1)(A) in particularly extraordinary or compelling circumstances not reasonably foreseen by the court at the time of sentencing. The request arises under 18 U.S.C. 3582(c)(1)(A).

In this Application I will demonstrate the circumstances believed to warrant consideration for HOME CONFINEMENT, or; COMPASSIONATE RELEASE and/or REDUCTION OF SENTENCE, and; a proposed release plan in the event this request is granted.

18 USC §3582(c)(1)(A) provides that;

(c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that --

(1) in any case --

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's half or the lapse of 30 days from the time of receipt of such request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and conditions) that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in 3583(a) [18 USC 3553(a)] to the extent that they are applicable if it finds that --

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) . . ."

The use of the "or" after §3582(c)(1)(A)(i) means that "part "(ii)" does not have to be considered.

Under a request for reduction under §3582(c)(1)(A)(i), the only ineligible offenders are those with State cases; D.C cases, and; those with cases prior to November 11, 1987, as governed by 28CFR §571.64, and furthermore the turn "terminal illness" only applies to part (d)" of §3582 and therefore not a prerequisite to relief under §3582(c)(1)(A).

I now refer to part "(a)" of §3582 which it speaks of imprisonment not being an appropriate means of promoting correction and rehabilitation after considering the factors under §3553(a). In a court hearing for my change of plea that was commenced at 1:34 pm on the 8th of August, 2018, in Courtroom A901 in the United States Courthouse of Denver, Colorado, Honorable Judge Marcia S. Krieger, elaborated each of the legal factors under §3553 that could be brought at my sentencing hearing. At sentencing, Judge Krieger stated that I qualified for a downward variance, applicable to §3553 factors that I was entitled. Additionally the government prosecuting my case and probation officer applied and asked for a downward variance as well, adding, "the government acknowledges that the defendant's age distinguishes him from other offenders [...] the defendant was 18 years of age." See page 9, Para 2, of Doc. 72 "Government's Sentencing Statement And Motion for Downward Variance." I was sentenced to 240 months' imprisonment and 240 months' supervised release.

I now further assert that, under §3582(c)(1)(A), the Court can now re-consider the factors set forth in §3553(a) without regard for the previous determinations set forth at sentencing.

I now demonstrate the circumstances I believe warrant the consideration of placement in HOME CONFINEMENT, or; COMPASSIONATE RELEASE and/or REDUCTION IN SENTENCE.

Beginning on or about March 13, 2020, the BOP began implementing procedures nationwide in its facilities due to the COVID-19 Pandemic.

From about March 26th – April 5th, 2020, the BOP was instructed to start releasing at risk inmates to Home Confinement and Reduction of Sentences to "time served."

In assessing eligibility of inmates to Home Confinement, Attorney General William Barr sent a memorandum to the Director of the BOP, and I now refer, the eligibility requirements and the COVID-19 Pandemic in and of itself, as extraordinary and/or compelling circumstances to warrant HOME CONFINEMENT, or; COMPASSIONATE RELEASE and/or REDUCTION OF SENTENCE under §3582(c)(1)(A)

- The age and vulnerability of the inmate to COVID-19 accordance with the Center for Disease Control and Prevention (CDC guidelines)

I am 24 years of age and well within the age parameter affected by COVID-19. In recent days, the age of young people 20-38 getting exposed and infected by the virus and dying is greater than it was back in March, and as time goes on the average age is declining. I am hispanic. In my family there is a long history of type 1 and type 2 diabetes, breast and colon cancer, and at a young age was re-exposed to secondhand smoking, which causes respitory problems as one ages, and am predisposed to those current and future medical conditions. I was born with the birthing sacl wrapped around my neck, which greatly effected my immune system and I still have problems today because of it. I was born with a heart murmur that causes me to

run out of breath quickly. I am under weight by 15-20 pounds for a 24 yo, 5'7", male. I have a handful of mental health disorders and have a lower than average testosterone and vitamin D level. All of the above listed factors are within the CDC guidelines to exposure and death of COVID-19, therefore I believe I demonstrate vulnerability to COVID-19.

- The Security level of the facility currently holding the inmate; with priority given to inmates residing in low and minimum security facilities.

The Security designation for Marion USP is medium-high, and as of February 2020, I have had low Security points. I was designated to transfer to FCI La Tuna in El Paso, Texas, which is a low, but due to COVID-19, no transfers are taking place throughout the Federal Bureau of Prisons.

- Current facility COVID-19 crisis

As of July 16, 2020 an outbreak of the virus has occurred in one of the units at Marion USP. I live in that unit and am under current "High-Exposed Inmate" status for the next however long. A rapid test was conducted and at least 10 out of 70 inmates initially tested positive for COVID-19; 5, at that time lived on my range - 1 being my neighbor.

Over the course of the last 5 months since the initial lock down order on April 1st, 2020 by the Director of the BOP, minimal has been done by Marion Staff to prevent the virus from entering the facility (mainly being officers who are essentially the ones bringing the virus in the facility) who forego the appropriate procedures to make the exposure minimal. Lack of mask wearing, not wearing gloves when passing out food, and not allowing proper sanitation to be done ultimately ended up with COVID-19 spreading in my unit - exposing and placing my health at major risk. For 7 days after the initial exposure in my unit, administration kept both positive inmates and negative inmates in close proximity. Because of this, after the week, the number of positive cases doubled! For 7 days I was forced to live next to 2 COVID-19 inmates. And for reasons unknown these inmates were not taken to a controlled

~~Environment~~ environment. This aftermath has now made 13 other inmates positive and allowing the COVID-19 virus to spread even further! My neighbor's doors are approximately 3½ feet away from mine and instead of solid doors, we have bar-inplaced, open grates that make the chances of my exposure that much greater. The CDC guidelines require at least 6 feet distance for less exposure but I am not granted that luxury due to the proximity between me and the other inmates and the lay-out of the unit.

I now refer you to part of the Sentencing Reform Act, Act Oct. 12, 1984, P.L. 98-473, Title II, Ch II §239 98 Stat. 2039, as provided by §235 (a)(1) "Since, due to an impending crisis in prison overcrowding, available federal prison space must be treated as a scarce resource in sentencing of criminal defendants'; "Since, Sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who post the most dangerous threat to society."

• My criminal and mental evaluations, rehabilitation and programming

I was evaluated 5 different times by court appointed and referred psychologists. Brigit Fisher Ph.D - evalvated 3 times, Max Wachtel Ph.D - evaluated 1 times, and Susan Bograd Ph.D - evaluated 1 time. I also have been seeing the on-site psychologist since my incarceration. Currently, I see Dr. Goathier a little less than one time a month since the Pandemic lockdown was implimented and have had severe trouble getting in contact with him I haven't had accurated counseling for nearly 5 months.

I am not a danger to society — the main source to Judge Krieger's imposed sentence. In my evaluations each doctor stated their concerns for a lengthy sentence and asked the courts for the minimum sentence available. Additionally, my mental disorders in equivilance to my crimes was also conducted.

Dr Fisher's 3 piece evaluations (one psychosexual, one addendum, and another follow-up evaluation) determined that I suffered from PTSD, Adjustment disorder, Anxiety, Severe Depression, and other specified personality disorder with dissociative episodes. She adds, "Mr. Perez is generally able to reason and think before acting.

8

this ability is currently compromised by considerable distress related to feelings of anxiety sadness, loneliness, and helplessness... A high complexity score points to traumatic flooding... findings are likely associated with periods of dissociation or disruptions in aspects of consciousness." Her findings also state that, "recidivism rate risk falls in the moderate-low range," and "he does not display antisocial criminal traits or characteristics associated with psychopathy. These findings are seen as protective factors and [] suggest Mr. Perez will not be a danger to the community once he complete[s] treatment. Dr. Fisher also emphasizes on my Affinity Test and Static-99R results - tests that determines one sexual interests and potential deviancy: "Mr. Perez did not show any deviant sexual interest in prepubescent children during this assessment." And, "Mr. Perez's score [on the Static-99R] into risk categories reveals his risk to fall in the average risk range, formally labeled the low-moderate risk range." Furthermore, Dr. Fisher elaborately concludes, "it is important to recognize that his own sexual victimization and the unresolved trauma played a prominent role in the offending behavior. [I]f [Mr. Perez] is incarcerated for a lengthy period of time and placed in treatment with higher risk offenders... his recidivism risk will likely increase. It is especially critical as the offending behavior wasn't driven by sexual deviance but by factors such as his own sexual victimization and the associated trauma issues that were never addressed. Treatment should target these risk factors [to] avoid future high-risk situations. Treatment [needs] to address emotional regulation, distress, tolerance and interpersonal effectiveness as well as the skills needed to remain mindful of internal states or external triggers that dysregulate him and increase the chance of acting out behaviorally. [Lastly], [i]t is important to recognize Mr. Perez's strengths and build on them in future treatment, such as his desire to make repairs to his family, his desire for a healthy partner relationship and his willingness to engage in treatment. Accordingly, it is recommended that 'the shortest sentence allowed by the statutes be granted.'"

Dr. Wachtel: Diagnoses - PTSD, Major Depressive Disorder, Other Specified Personality Disorder, Alcohol use disorder, Cannabis use disorder. Dr. Wachtel's findings suggest, "It is highly likely this dissociation has caused Mr. Perez to place himself in risky situations in the past and to engage in ill-advised activities."

On the positive side, [he] has expressed awareness of his mental struggles and his desire to make positive changes in his life. He has a highly positive view of psychotherapy and he has demonstrated the ability to connect with a therapist in a healthy way [ ]. Further, [Mr. Perez], fully understands and appreciates how problematic his behavior from his past was (including his substance use, his risky sexual behavior, and the behavior that led to the current matter before the court). He has awareness of how his past behavior was not only hurting him but also hurting those around him, and he feels remorse about what he has done. Also, Mr. Perez is still young and his brain has not finished the maturation process. Because of this, research has shown very clearly that he is more likely than an older adult to be able to change aspects of his personality, his maturity level, and his impulsive behavior. When combined with his amenability to treatment and his self-awareness, his young age makes his prognosis for improvement fairly positive. If he is placed in a therapeutic environment, there is a reasonable chance, given the above-mentioned factors, that Mr. Perez can mature and make meaningful changes that will be positive for him and others and leave the public a safer place when he is eventually released. If he is placed in a normal federal prison facility, his prognosis worsens considerably, and it is significantly less likely that the public would be safer as a result." Dr. Wachtel also recommended that I be placed in a therapeutic, hospital-like detention facility: [One that offers] sex offense specific treatment, intensive treatment for his PTSD, depression, and personality disorder, Dialectical Behavior Therapy, evidence-based treatment for EMDR, [and] Cognitive Behavior Therapy. [Mr. Perez] would not be able to receive the kind of intense treatment he needs in a nontherapeutic facility, and treatment for his PTSD and depression is crucial in his maturation and in his lowering his future risk level. Although most federal facilities have access to psychiatrists (in many cases, federal facilities use telemedicine, where the same psychiatrists do not follow the inmate over time), he would not likely be able to receive the intensive medical care he requires in a typical federal prison."

Dr. Bograd - Diagnoses - PTSD, Major Depressive Disorder. A court appointed mental evaluation was conducted and the research provided that, "[Mr. Perez]

hobby craft." Wellness - "include screening, assessments, goal setting, fitness/nutrition, prescriptions and counseling."; Psychology Services - "A psychologist may make recommendations to support your successful adjustment to prison and prepare you for your eventual release. We encourage you to participate actively in this process."; Drug Abuse Program: NonResidential Drug Abuse Treatment and Residential Drug Abuse Treatment - "The RDAP is operated as a modified therapeutic community where inmates are expected to model the pro-social behaviors expected in a community."; Nonresidential Counseling Groups - "These groups are designed to improve coping skills to build healthy relationships, and enhance emotional stability."; Sex Offender Management Program: Residential and NonResidential; and Barber Shop.

I state and elaborate on each available program that fits my personal criteria based on the findings of the psychological reports, the court's interests, and personal rehabilitation ambitions. I am currently and have not been afforded ANY of these programs for 5 months. Each prison is supposed to provide programs to delute recidivism rates and since the Pandemic has started I have not been able to capitalize or exceed the court's expectations on their goal (and my personal goal) to join these programs to build better character. Before the Pandemic, I was working more than 150 hours a month at UNICOR and striving to receive certificates for each program I involved myself in. I cannot see psychology effectively or in proper confidence - "Confidentiality is an important component of the therapeutic relationship. Mental health providers in the institution not only serve inmates, they also serve the institution and the public at large." In the last 5 months, I have only seen my psychologist twice. I have little faith that, as of the new positive cases in my unit, I won't be able to see the appropiate staff memenbers to conduct the severity of my mental health accordingly.

Moreover, visitations and phone calls (I am not allowed access to emails at this institution) have also taken a hard impact at Marion USP. Although the Federal Director added an addition 200 free minutes per inmate in response to easing visits, we only get 7 minute phone calls per call. In an added program

was competent to understand the proceeding in the current legal case." In Bogard's opinion, she also added, "that it is extraordinarily difficult for him to be isolated with no contact with family."

Each of these evaluations can be founded in the court directories under the case no. 17-CR-00340-MSK or in the Presentence Report Investigation (PSI).

Programming: USP Marion has many programs to offer to inmates, such as: Job Assignments - "This might include work in Food Service, as a unit orderly, or in a maintance shop [or] in factories operated by Federal Prison Industries, also known as UNICOR."; Education - "education/recreation and related programs that meet the needs and interests of the inmate population provide options for the positive use of inmate time, and enhance successful reintegration into the community. Inmates who have a high school diploma [.] are encouraged to submit a cop-out to the Education Department to request to sign-up [...] to ensure these inmates have sufficient [ ] skills to pursue their post-secondary education study and/or obtain a job in the community. The completion of the literacy program is often the first step towards adequate preperation for successful post-release reintergation into society. Additional educational programs such as advanced occupational training or college are needed in today's world. Vocational training and apprenticeship programs afford inmates an opportunity to obtain marketable job skills."; Occupational Education Programs; Apprenticeships - "training provides inmates the opportunity to participate in training which prepares them for employment in various trades. These programs are structured to offer on-the-job learning in industries"; Adult Continuing Education (ACE) - "ACE classes enhance an inmate's general knowledge on various subject and addresses the skill deficits identified in an inmate's individual reentry plan"; Post-Secondary Education (Inmate Correspondence Course) - "Inmates are encouraged ... to expand their knowledge through a variety of methods, including correspondence courses."; Library Services; Recreation, Leisure, wellness, and Social programming: "These programs strive to provide inmates with opportunities to reduce stress and enhance overall health and emotional well-being." Arts and Hobby Craft Programs - "Inmates are encouraged to participate in housing unit activities such as unit based

Statement by the BOP in April, "these privileges are a supplemental means of maintaining community and family ties" and are a big aspect towards rehabilitation. Furthermore, we have not received the video visits the BOP said we all would get. As of July 16, 2020, when the outbreak in my unit happened, every tie within the community has been taken away from me: No physical mail is allowed in or out of my unit, no emails, and no phone calls are allowed to let our families know what is happening to us; and it can be weeks or even months until we are able to fully be able to contact our families again.

I have sent a plethora of cop-outs to request information about the living conditions in which I live: We were not offered showers for nearly 8 days, the mailing program, keeping positive inmates with non-positive inmates for more than a week, and our legal services. To this day, all my questions have been deterred and neglected. I cannot even access the law library or call my lawyers if needed.

The conditions in which I currently live is quite egregious, and in particular, does not satisfy the needs specifically stated by the Courts to help my rehabilitation to make the public a safer environment. We are living as we're being punished for the virus impacting the institution when I could be out in society taking the needed classes and counseling I truly need.*

Lastly, it is obvious that Marion USP was not well prepared or equipped for a COVID-19 outbreak. Since these draconian rules were precipitously set in motion for their so-called, "it's for the safety of the staff, institution, and inmates." We still have officers who refuse to wear mask in the infected unit that could spread to other units and as easily to other inmates. USP Marion does not care about the safety of their inmates.

- Inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment.

I am currently housed in C-Unit (priority housing) and have not incurred an incident report since my arrival at Marion USP.

As demonstrated, I am at 12 points and do not belong at this medium/high facility. With my clear conduct history, low recidivism risk rate, proven not a danger to society, enthusiasm to better myself and the community through proper psychological treatment, and now high exposure and daily vulnerability to COVID-19 and potential death, relief by HOME CONFINEMENT, or; COMPASSIONATE RELEASE and/or REDUCTION OF SENTENCE under § 3582 (c)(1)(A)(i) is warranted to free up the "scarce resources" of available prison space.

Finally, I present my proposed release plan for the event this request is granted:

• 18 U.S.C. § 3582 (c)(1)(A) provides that the court, upon releasing the term of imprisonment, may impose a term of supervised release with or without conditions not exceeding the unserved portion of the original term of imprisonment. The court may also reduce the sentence completely to "Time Served" with no supervised release. While I would like to request a reduced sentence with no supervised release, I know that is at the discretion of the court. ...

As per acknowledgment from the BOP, and since my arrest and currently, I have remarkable ties with the community. I would have no trouble finding an approved address to live at and no trouble concreting a good enough job. I have many loved ones who will be willing to accomodate my circumstances if need be.

My ambitions for continued psychological treatment, including Sex Offender treatment, will not cease and will be my first priority once/if released.

If this request is granted and my sentence is reduced to Time Served with no supervised release, I, will have no legal requirements no obligations.

meet, other than registration, though I'm not sure if it will be required in my case, as my court imposed fines have already be paid off since my current incarceration. The only thing that would concern me would be the SORNA requirements, if applicable, that would affect my family life, community life, education, and occupations.

I would easily abide by any rules the courts or probation officers require me to do. I will live in or about Denver. I will get an essential job to pay for the courses/classes I will take. Go back to school to further my education. Continue to support my 84-year-old grandma who is in dire need for around-the-clock assistance. Obtain a driver's License and buy a car to get to the probation office, school, work, and classes and counseling. And maintain a productive, abiding citizen clause to make sure all the needs of the community and society are met. I will not fail the system. I am determined to get the chance and prove my worth; I will not come back to prison or violate any terms or conditions set forth by the courts.

In conclusion, I request to be placed on HOME CONFINEMENT, or; COMPASSIONATE RELEASE and/or REDUCTION OF SENTENCE under 18 USC §3582(c)(1)(A)(i) to be filed on my behalf for all the aforementioned reasons herein this Application listed. Thank you for your time and consideration.

Respectfully submitted,

Alexander Perez

Alexander Isaiah Perez [44217-013]

* Judge Krieger was very adament on the BOP and their psychological programming; however since April 1, 2020 I have not been allowed proper psychological gains that I was so briefly offered before the Pandemic. I was also doing my best to be productive, and in the whole year and a half I've resided at Marion, I have had no incident reports. I had a job and was implementing the tools the facility offered. All this ceased since the Pandemic erupted. I am now trapped in a room 20 hours a day not allowed to Program and to be productive with for 5 months

the lack of correspondence between Staff and now have been only allowed 7 minute phone calls, my progression has taken an abrupt halt. CSW Clark even stated in my last Team Meeting that, "Nothing's changed because no one can program."

Alexander Isaiah Perez
44217-013
United States Penitentiary
PO Box 1000
Marion, Illinois
62959




Clerk of Court
Alfred Arraj US courthouse
901 2nd FL 19th Street
Denver, Colorado
80294

Legal
Mail